## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

HOWARD DILWORTH, BEWING DORN, )
JAMES JACKS, ELBERT LEWIS, )
ESTER BASS, DARRELL JONES, )
DOYNE ELMORE, J. W. BRENTS, )
WILLIAM WESLEY JAMES, )
MARK BRENTS, STANLEY WILKINS, )
CAM COPELAND, JR., LARRY CHRISTIAN )
CHARLIE AKRIDGE, DELMAR BATES )
GLEN HUBBARD AND BOBBY LEWIS )
         )
      **PLAINTIFFS** )
      **vs.** )
         )
LINCOLN ELECTRIC COMPANY; )
LINCOLN ELECTRIC HOLDINGS, INC.; )
AIRGAS MID-SOUTH, INC.; )
THE AMERICAN WELDING SOCIETY; )
A. O. SMITH CORPORATION; ARCOS )
INDUSTRIES, L.L.C. as Successors to ARCOS )
ALLOYS CORPORATION; THE BOC )
GROUP f/k/a AIRCO, INC; )
CATERPILLAR, INC.; )
THE DOW CHEMICAL COMPANY; )
DELORO STELLITE COMPANY, INC.; )
THE ESAB GROUP, INC.; EUTECTIC )
CORPORATION; GENERAL ELECTRIC )
COMPANY; WELSCO, INC.; )
HOBART BROTHERS COMPANY; )
ILLINOIS TOOL WORKS, INC.; THE )
METROPOLITAN LIFE )
INSURANCE COMPANY; MILLER )
ELECTRIC MFG. CO. a/k/a MILLER )
ELECTRIC MANUFACTURING CO., INC.; )
PRAXAIR, INC.; SANDVIK, INC.; SELECT )
ARC, INC.; SOCRA CORPORATION as )
Successor to ARCOS ALLOYS )
CORPORATION; STOODY COMPANY; )
TDY INDUSTRIES, INC.; THERMADYNE )
HOLDINGS CORPORATION a/k/a )
THERMADYNE INDUSTRIES, INC.; UNION )
CARBIDE CORPORATION f/k/a  UNION )
CARBIDE CHEMICALS AND PLASTICS )
COMPANY, INC.; VIACOM INC.; )
INDUSTRIAL WELDING SUPPLIES OF )

CASE NO.: CV-04-904-4

**COMPLAINT**
(Jury Demand)

EXHIBIT
I

A TRUE COPY, I CERTIFY
FLORA C. COOK, Clerk
*[signature]*

*30*

FILED IN MY OFFICE AND SUMMONS
ISSUED AT 11:50 O'CLOCK A M
11-18-04 DATE
JEANETTE HENCE CLERK
*[signature]*

27338

**HATTIESBURG, INC. d/b/a NORDAN-** )
**SMITH; WESTINGHOUSE** )
**ELECTRIC CORPORATION; and** )
**JOHN DOE DEFENDANTS 1-25** )
)
**DEFENDANTS** )

Plaintiffs, for their Complaint, allege as follows based upon personal knowledge as to

their own acts, and upon information and belief as well as their attorneys' investigation as to the

acts of Defendants:

## *THE PARTIES*

1.      The Plaintiff, Howard Dilworth, is an adult resident citizen of Jefferson County,

Arkansas, residing at 2503 Pine Hill Drive, Pine Bluff, Arkansas 71603. The Plaintiff, Bewing

Dorn, is an adult resident citizen of Jefferson County, Arkansas, residing at P.O. Box 2045, Pine

Bluff, Arkansas 71603. The Plaintiff, James Jacks, is an adult resident citizen of Cleveland

County, Arkansas, residing at 239 Highway 114, Rison, Arkansas 71665, having worked in

Jefferson County, Arkansas. The Plaintiff, Elbert Lewis is an adult resident citizen of Saline

County, Arkansas, residing at 11725 Townsend Road, Benton, Arkansas 72015, having worked

in Jefferson County, Arkansas. The Plaintiff, Ester Bass, is an adult resident citizen of Lincoln

County, Arkansas, residing at 509 W. Star, Gould, Arkansas 71643, having worked in Jefferson

County, Arkansas.  The Plaintiff, Darrell Jones is an adult resident citizen of Perry County,

Arkansas, residing at 47 Tonja Circle, Houston, Arkansas 72070, having worked in Jefferson

County, Arkansas. The Plaintiff, Doyne Elmore, is an adult resident citizen of Scott County,

Arkansas, residing at 13158 Tut Hill Road, Manfield, Arkansas 72944, having worked in

2

Jefferson County, Arkansas. The Plaintiff, J. W. Brents is an adult resident citizen of Pulaski County, Arkansas, residing at 14425 Lawrence Road, Little Rock, Arkansas 72206, having worked in Jefferson County, Arkansas.    The Plaintiff, Mark Brents is an adult resident citizen of Pulaski County, Arkansas, residing at 14403 Lawrence Road, Little Rock, Arkansas 72206, having worked in Jefferson County, Arkansas. The Plaintiff, Stanley Wilkins is an adult resident citizen of Jefferson County, Arkansas, residing at P.O. Box 1481, Pine Bluff, Arkansas 71613. The Plaintiff, Cam Copeland, Jr. is an adult resident citizen of Saline County, Arkansas, residing at 1210 Mulberry Acres, Benton, Arkansas 72015, having worked in Jefferson County, Arkansas. The Plaintiff, Larry Christian is an adult resident citizen of Jefferson County, Arkansas, residing at 11521 Lee Springs Road, Pine Bluff, Arkansas 71603. The Plaintiff, William Wesley James is an adult resident citizen of Drew County, Arkansas, residing at P.O. Box 591, Monticello, Arkansas 71657, having worked in Jefferson County, Arkansas. The Plaintiff, Charlie Akridge is an adult resident citizen of Perry County, Arkansas, residing at 504 Scenic Drive, Perryville, Arkansas, having worked in Jefferson County, Arkansas. The Plaintiff, Delmar Bates is an adult resident citizen of Garland County, Arkansas, residing at 612 Summer Street, Hot Springs, Arkansas 71913, having worked in Jefferson County, Arkansas. The Plaintiff, Glen Hubbard is an adult resident citizen of Missouri, residing at 181 South Slope Drive, Robertsville, Missouri 63072, having worked in Jefferson County, Arkansas.    The Plaintiff, Bobby Lewis is an adult resident citizen of Jefferson County, Arkansas, residing at 9829 Hwy. 270, Pine Bluff, Arkansas 71602.

    2.      The Defendants are:

3

a.      Airgas Mid-South, Inc. ("Airgas") (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of Delaware that is qualified to do business in Arkansas and doing business in Arkansas, with The Corporation Company, 425 West Capitol Avenue, Suite 1700, Little Rock, Arkansas 71101, as its agent for service of process;

b.      The American Welding Society ("AWS"), a trade and professional organization that has within its membership management representatives of companies that produce welding products, that may be served with process by service on Richard L. Arn, president, 37104 Laughlin Rd., Lisbon, OH 44432;

c.      A. O. Smith Corporation ("Smith") (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of Delaware that is qualified to do business in Arkansas and doing business in Arkansas, with Prentice-Hall Corporation System, One River Front Place, 8th Floor, North Little Rock, Arkansas 72114, as its agent for service of process;

d.      ARCOS Industries, L.L.C., as successors to ARCOS ALLOYs Corporation ("ARCOS") (sometimes referred to herein as a "Welding Defendant"), is a foreign limited liability company, that has done and is doing business in Arkansas, with its principal place of business is 1 ARCOS Drive, Mt. Carmel, Pennsylvania 17851-2511;

e.      The BOC Group, Inc. f/k/a Airco, Inc. ("BOC Group"), (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of Delaware that is qualified to do business in Arkansas and doing business in Arkansas, with The Corporation Company, 425 West Capitol Avenue, Suite 1700, Little Rock, Arkansas 72201, as its agent for service of process;

f.      Caterpillar, Inc. ("Caterpillar") (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of Delaware that is qualified to do business in Arkansas and doing business in Arkansas, with The Corporation Company 425 West Capitol Avenue, Suite 1700, Little Rock, Arkansas 72201, as its agent for service of process;

g.      The Dow Chemical Company ("Dow Chemical") (sometimes referred to herein as a "Welding Defendant"), is a foreign corporation incorporated under the laws of the State of Delaware that has done and is doing business in Arkansas, is qualified to do business in Arkansas, with The Corporation Company, 425 W. Capitol, Suite 1700, Little Rock, Arkansas 72201, as its agent for service of process;

4

h. Deloro Stellite Company, Inc. ("Deloro") (sometimes referred to herein as a Welding Defendant"), a corporation incorporated under the laws of Delaware that has done and is doing business in Arkansas, but is not qualified to do business in Arkansas, with C.T. Corporation System, 120 South Central Avenue, Clayton, MO 63105;

i. The ESAB Group, Inc. ("ESAB") (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of Ohio that has done and is doing business in Arkansas but is not qualified to do business in Arkansas, with The Corporation Trust Company, The Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801, as its agent for service of process;

j. Eutectic Corporation ("Eutectic") (sometimes referred to herein as a "Welding Defendant"), a corporation organized under the laws of New York that has done and is doing business in Arkansas, but is not qualified to do business in Arkansas, with Lawdock, Inc. and Mitchell S. Moser, Quarrells and Brady, 411 East Wisconsin Avenue, Suite 2040, Milwaukee, WI 53202-4497, as its agent for service of process;

k. General Electric Company ("General Electric"), (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of New York that is qualified to do business in Arkansas and doing business in Arkansas, with The Corporation Company, 425 West Capitol Avenue, Suite 1700, Little Rock, Arkansas 72201, as its agent for service of process;

l. Welsco, Inc. ("Welsco"), (sometimes referred to herein as a "Supplier Defendant") is an Arkansas corporation qualified, to do business in Arkansas and is doing business in Arkansas, has its principal place of business in Arkansas and can be served with process at its Corporate Headquarters, Angela E. Harrison, Agent for Service, 9006 Crystal Hill Road, North Little Rock, Arkansas 72113;

m. Hobart Brothers Company ("Hobart") (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of Ohio that has done and is doing business in Arkansas but is not qualified to do business in Arkansas, with C.T. Corporation System, 1300 E. 9th St., Cleveland, Ohio 44114, as its agent for service of process;

n. Illinois Tool Works, Inc. ("Illinois Tool Works") (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of Delaware that is qualified to do business in Arkansas and doing business in

Arkansas, with The Corporation Company, 425 West Capitol Avenue, Suite 1700, Little Rock, Arkansas 72201, as its agent for service of process;

o. The Lincoln Electric Company ("Lincoln") (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of Ohio that has done and is doing business in Arkansas but is not qualified to do business in Arkansas, with H. Jay Elliot, 22801 St. Clair Avenue, Cleveland, Ohio 44117, as its agent for service of process;

p. Lincoln Electric Holdings, Inc. ("Lincoln Holdings") (sometimes referred to herein as a "Welding Defendant"), is a corporation incorporated under the laws of Ohio that has done and is doing business in Arkansas, but is not qualified to do business in Arkansas, with C T Corporation System, 1300 E 9th Street, Cleveland, Ohio 44114, as its agent for service of process;

q. Metropolitan Life Insurance Company ("MET Life") a corporation which has conducted and does conduct business in Arkansas, and maybe served through the Arkansas Insurance Commissioner;

r. Miller Electric Mfg. Co. a/k/a Miller Electric Manufacturing Co., Inc. ("Miller Electric") (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of Wisconsin that has done and is doing business in Arkansas, with CT Corporation System, 44 E. Mifflin St., Madison, WI 53703, as its agent for service of process;

s. Praxair, Inc. ("Praxair"), (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of Delaware that is qualified to do business in Arkansas and doing business in Arkansas, with Corporation Service Company, 120 East Fourth Street, Little Rock, Arkansas 72201, as its agent for service of process;

t. Sandvik, Inc. ("Sandvik") (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of Delaware that has done and is doing business in Arkansas, but is not qualified to do business in Arkansas, with C. T. Corporation System, 818 W. 7th Street, Los Angeles, CA 90017, as its agent for service of process;

u. Select Arc, Inc. ("Select Arc") (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of Ohio that has done and is doing business in Arkansas but is not qualified to do business in Arkansas, with Paul E. Zimmer, 2700 Ketting Tower, 40 N. Main St., Dayton, OH 45423, as its agent for service of process;

6

v.   SOCRA Corporation, as Successor to ARCOS Alloys Corporation; ("SOCRA") (sometimes referred to herein as a "Welding Defendant"), is a corporation incorporated under the laws of the State of Pennsylvania, that has done and is doing business in Arkansas, but is not qualified to do business in Arkansas, with its principal place of business at 1 ARCOS Drive, Mount Carmel, Pennsylvania 17851;

w.   Stoody Company (sometimes referred to herein as a "Welding Defendant"), is a corporation incorporated under the laws of the State of Delaware, that has done and is doing business in Arkansas, but is not qualified to do business in Arkansas, with The Corporation Company, 120 South Central Avenue, Clayton, MO 63105 as its agent for service of process;

x.   TDY Industries, Inc. ("Teledyne") (sometimes referred to herein as a "Welding Defendant"), formerly known as Teledyne Industries, Inc., a corporation incorporated under the laws of California that is qualified to do business in Arkansas and doing business in Arkansas, with The Corporation Company, 425 West Capitol Avenue, Suite 1700, Little Rock, Arkansas 72201, as its agent for service of process;

y.   Thermadyne Holdings Corporation a/k/a Thermadyne Industries, Inc. (sometimes referred to herein as a "Welding Defendant"), is a corporation incorporated under the laws of the State of Delaware, that has done and is doing business in Arkansas, but is not qualified to do business in Arkansas, with C.T. Corporation System, 120 South Central Avenue, Clayton, MO 63105;

z.   Union Carbide Corporation f/k/a Union Carbide Chemicals & Plastic Company, Inc. ("Union Carbide"), (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of New York that is qualified to do business in Arkansas and doing business in Arkansas, with The Corporation Company, 425 West Capitol Avenue, Suite 1700, Little Rock, Arkansas 72201, as its agent for service of process;

aa.   Viacom Inc. ("Viacom") (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of Delaware that is doing business in Arkansas with Corporation Service Company, 80 State Street, Albany, NY 12207, as its agent for service of process;

bb.   Industrial Welding Supplies of Hattiesburg, Inc., d/b/a Nordan-Smith (sometimes referred to herein as a "Welding Defendant"), is a foreign corporation qualified to do business in Arkansas and doing business in

7

Arkansas, with The Corporation Company, 425 West Capitol Avenue, Suite 1700, Little Rock, Arkansas 72201 as its agent for service of process;

cc.    Westinghouse Electric Corporation ("Westinghouse"), (sometimes referred to herein as a "Welding Defendant"), a corporation incorporated under the laws of Pennsylvania that is qualified to do business in  Arkansas and doing business in Arkansas, with The Corporation Company, 425 West Capitol Avenue, Suite 1700, Little Rock, Arkansas, as its agent for service of process;

dd.    John Doe Defendants 1-25, whose identities are unknown to the Plaintiffs at this time, but when those parties' true identities are discovered, the pleadings will be amended by substituting their true names and giving proper notice to these parties, pursuant to *Ark. Code Ann. §16-56-125*.  These Defendants include sellers, suppliers, distributors, and manufacturers that, at any time relevant to these proceedings, supplied welding equipment, supplies, and steel/metal products containing manganese to Cotton Belt Railroad, International Paper Company, Georgia Pacific, Southern Pacific Railroad, Union Pacific Railroad, Varco Steel, Pine Bluff Arsenal and Central Maloney in Arkansas and other work sites where the exposure alleged in the Complaint occurred, and also include unknown members of AWS, NEMA and TFA, whose negligence and breaches caused or contributed to cause the Plaintiffs' damages and injuries.

## *JURISDICTION AND VENUE*

3.    This Court has jurisdiction of this action and the parties hereto.  Venue is proper pursuant to *Arkansas Code Ann. §16-55-213* since the Plaintiffs either reside in Jefferson County, Arkansas or the injury in whole and/or in part occurred in Jefferson County, Arkansas.

## *FACTS*

4.    Plaintiffs, during all relevant times before March 25, 2003, were exposed to toxic fumes resulting from welding while working in Jefferson County, Arkansas and other counties throughout Arkansas and other jurisdictions.  The ordinary and intended use of welding products causes emission of fumes that contain manganese ("welding fumes").

8

5.     Since 1837, manganese has been medically recognized as toxic to the human central nervous system in levels that exceed the trace amounts normally found in the human body. Toxicity of manganese causes progressive, disabling neurological damage known as manganese poisoning. People who suffer from manganese poisoning suffer from debilitating neurological problems that affect their ability to think, talk, eat, move, sleep, and work.

6.     Persons exposed to welding fumes absorb them into their body primarily through inhalation. Manganese exposure for a period as short as 49 days causes manganese poisoning and progressive, disabling, neurological damage.  Plaintiffs were directly exposed to manganese laden welding fumes while using manganese containing welding products or equipment and/or were indirectly exposed to manganese laden welding fumes as a bystander while working in the proximity of other persons using welding products or equipment in the State of Arkansas.  Plaintiffs were exposed to welding fumes for at least forty-nine days during the time that they were using and/or exposed to manganese containing welding products or equipment.

7.     As a direct and proximate result of exposure to welding fumes, Plaintiffs suffered permanent neurological and physical damage, severe physical and mental pain, loss of wages, loss of earning capacity, disability, medical expenses, and loss of enjoyment of life.

8.     At all relevant times, Plaintiffs were unaware of the dangerous nature of welding fumes, manganese, and the neurological injuries that could occur because of exposure to welding fumes.  As a direct and proximate result of exposure to welding fumes, Plaintiffs developed and have been diagnosed with manganese poisoning, also known has manganism.

9

9.   Any reasonable person, including Plaintiffs, if adequately informed of the hazards of exposure to welding fumes, would not have willingly exposed themselves to welding fumes in workplaces without necessary precautionary measures.

10.   All of the Defendants are or were manufacturers, sellers, suppliers or large industrial consumers of welding products.

11.   Through industry and medical studies, unknown to the Plaintiffs, the Defendants knew or should have known of the health hazards inherent in the products they were selling, distributing, or using.  The Defendants ignored or deliberately and fraudulently concealed that information, or condoned the concealment, and/or conspired with, advised, encouraged, or aided others and/or each other to do so, in order to sell their products and/or avoid the costs of safety precautions, and/or avoid litigation by people injured by welding fumes.  Plaintiffs relied on Defendants' conduct, representations, statements and/or non-statements in using the welding consumables and had a right to rely on Defendants' conduct, representations, statements and/or non-statements as an intended user of Defendants' products.  The actions or inactions constitute gross negligence and demonstrate a reckless disregard for the rights and safety of others, justifying punitive damages against the Defendants.

12.   The Defendants committed numerous tortious acts that included fraudulently and negligently misrepresenting, concealing, suppressing, and omitting material information about the health effects of welding fumes and precautionary measures as specifically alleged below.

10

13. The National Electric Manufacturers Association ("NEMA") is a trade organization comprised of manufacturers that has a section devoted to the manufacturers of welding products known as "NEMA Electric Welding Section" or "NEMA Arc Welding Section" ("NEMA Welding Section").

14. The American Welding Society ("AWS") is an industrial trade organization of manufacturers, suppliers and users of manganese containing welding products and equipment.

15. The Ferroalloys Associations ("TFA") is an industry advocacy group consisting of producers of chromium, manganese, silicon, and vanadium ferroalloys that sponsored a manganese subcommittee that includes representatives from welding manufacturers and the AWS and NEMA. The TFA's membership included management representatives of companies that produce welding products and large consumers that purchase the products for use in their operations.

16. NEMA, AWS, and TFA's membership included upper level management representatives of manufacturers, including the Welding Defendants that produced manganese containing welding products as well as large consumers and suppliers that purchased the products for use in their operations.

17. At all times herein, the Welding Defendants, including, but not limited to ARCOS, General Electric, Lincoln and Viacom, created committees within these trade organizations and then used the committees to fraudulently and negligently misrepresent, conceal, suppress, and omit material information about the health effects of welding fumes and necessary precautionary measures.

11

18.     Specific examples of the trade association committees controlled by the Welding Defendants and their activities are identified below.

19.     The Welding Defendants controlled and used the committees to conceal the dangers from people exposed to welding fumes by:

     i.    limiting individual membership on relevant committees exclusively or primarily to employees of the Welding Defendants or their designated representatives;

     ii.    maintaining, through the Welding Defendants' delegates, majority or exclusive voting control of the committees at all times;

     iii.    selecting the assignments or proposals considered by each committee;

     iv.    funding projects chosen by Welding Defendants;

     v.    using the Welding Defendants' delegates to prepare the written records of the business transacted by each committee;

     vi.    reviewing and editing, to the satisfaction of the Welding Defendants, studies performed by consultants hired by the committees.

20.     From at least 1937 to the present, the Welding Defendants, by their actions and through trade association committees controlled, undertook studies, issued product labels and other health and safety information, and issued specifications and standards for ventilation, safety equipment, and other precautionary measures.

21.     At all times, the Welding Defendants acted with the intent to conceal the health hazards of welding fumes, and specifically manganese, knowing that their studies, publications, specifications, and standards would be adopted and relied upon by manufacturers, sellers, and large consumers of welding products as the authoritative source for warnings, instructions, and

precautionary measures printed on product labels and otherwise distributed in the stream of commerce.

22.     The Defendants had actual knowledge about the causal relationship between manganese-containing welding fumes and neurological injury. The Defendants concealed this information from workers exposed to welding fumes.

23.     The causal connection between neurological injuries and welding fumes containing manganese has been scientifically documented since 1932.

24.     In 1932, a medical article was published by Dr. Erich Beintker documenting two cases of welders with neurological injury caused by manganese poisoning from welding fumes. The copy of this article or a summary of the medical article was received in the libraries of many or all Defendants.

25.     On information and belief, this Article and other factors caused MET Life to publish in or about 1938 a Welding Safety Booklet entitled "Health Protection and Welding." The MET Life Safety Booklet stated that manganese, a respirable fume present in welding operations "causes a disease similar to paralysis agitans [parkinson's disease] which in chronic cases is seldom fatal, but which . . . is always disabling." The MET Life booklet cited the 1932 Beintker article and stated that "[M]anganese is an important poison from the point of view of its effects rather than from frequency of exposure to it. Manganese has a selective action on some of the nerve centers in the brain. It causes a disease similar to paralysis agitans which . . . is always disabling." By 1937, members of the NEMA welding section, including the Welding Defendants, [and specifically, ARCOS, General

13

Electric, Lincoln and Viacom] knew of the contents of the 1932 Beintker Article and the contents of the MET Life Safety Booklet.

26. In or about January of 1938, MET Life decided to revise it's Safety Booklet and actively invited NEMA to participate in the redrafting. On or about January 3, 1938, W. J. McConnell, M.D. the Assistant Medical Director, Industrial Health Section, MET Life, wrote to W. Reddie, an employee of Westinghouse (predecessor to Viacom) and then chairman of NEMA's welding section, advising Reddie that MET Life's Welding Safety Booklet would be revised and that NEMA was invited to participate in the revision process.

27. On or about January 11, 1938, Reddie wrote to NEMA's director of engineering and stressed the importance of the revision of the publication and their cooperation between NEMA and MET Life in regard to their publications. Reddie further noted that the unrevised MET Life Welding Safety Booklet made recommendations that were:

> *[V]ery farfetched and would make welding appear to be an unusually hazardous occupation. This situation should not exist . . . What we want is a definite contact with the Metropolitan Life Insurance Company, which will insure cooperation between the NEMA welding section and the insurance company in regard to their publication.*

28. On January 30, 1938, the electric welding section of NEMA met and voted that "Chairman Reddie be empowered to act as a committee of one to follow this matter and assist in rewriting the [MET Life] booklet." Present at the meeting were the following NEMA members: ARCOS Alloys Corporation; Electrical Arc Cutting and Welding Company; General Electric Company; Harnischferger Corp.; Lincoln Electric Co.; Page Steel and Wire Division of American

Chain and Cable Company; Una Welding Company; and Westinghouse Company. The following were also present: Franklin Transformer Company; Marquette Manufacturing Company; McKay Company; NEMA Regulatory Legislation Department; and NEMA Electric Welding Section.

29.     On or about March 18, 1938, Airco, as predecessor to the BOC Group, published a "confidential report" which quoted the unrevised and original MET Life Welding Safety Booklet regarding the toxicity of manganese. The confidential report also noted the 1932 Beintker Article. On or about May of 1938, MET Life published it's second edition of "Health Protection and Welding." This booklet again stated that manganese causes a disease similar to parkinson's disease.

30.     On or about June 23, 1938 NEMA meeting minutes indicate that it's membership considered the revision of the MET Life Welding Safety Booklet only "80% successful." Present at the meeting were the following NEMA members: ARCOS Alloy Corporation; Champion Rivet Company; The Electric Arc Cutting and Welding Company; General Electric; Harnischferger Corp.; Lincoln Electric Company; Page Steel and Wire Division of American Chain and Cable Company; Una Welding Company; Westinghouse Company; and Wilson Welder and Metals, Company, Inc. The following were also present: American Welding Society; Franklin Transformer Company; Hollup Corporation; Marquette Manufacturing Company; Maurath, Inc.; McKay Company; NEMA Electric Welding Section; and Universal Power Corp. Reddie was the chairman and presided over the meeting.

15

31.     At the urging of NEMA and its members, MET Life omitted all of its earlier references to the effects of manganese poisoning. The subsequent addition of the MET Life booklet, as rewritten, stated as follows:

> *Selenium, manganese, antimony, chromates, and other rare materials may also be encountered in some welding operations. The amount present, however, usually is negligible, and no causes of poisoning from these materials have been definitely ascribed to welding.*

32.     In 1944, NEMA's Welding Section received notice of a claim of manganese poisoning in a welder.

33.     In 1958, the AWS sponsored Z49 Committee issued a technical document, (not intended for use by welders) approved by the AWS Technical Committee, an oversight committee for AWS activities, reflecting its knowledge that manganese in welding fumes is a potentially toxic substance.

34.     In 1966, at a meeting of a task group of the AWS Filler Metal Committee, members of the committee reviewed an industrial hygiene article identifying manganese as a toxic substance in welding fumes, and the Committee discussed neurological injuries in welders.

35.     In 1970, the AWS Task Group on Welding Fumes received notice, through a literature search submitted by a consultant hired by the Task Group on Welding Fumes, that welding fumes could cause neurological damage due to manganese poisoning, and that the symptoms of manganese poisoning resemble the symptoms of Parkinson's Disease.

36.     In 1970, the AWS Task Group on Welding Fumes received notice, through a welding fume study conducted by a consultant hired by the Task Group on Welding Fumes, that welding

fumes could easily exceed the recommended occupational exposure guidelines, even when ventilation standards specified by the Welding Defendants were followed.

37.    Beginning in the late 1970s, the AWS Safety and Health Committee received notice of claims of welders suffering neurological injuries from manganese in welding fumes.

38.    In 1978, the AWS Safety and Health Committee received notice, through a literature search report submitted by a consultant hired by the Committee, that welders can suffer neurological damage from manganese in welding fumes.  A portion of this report is quoted below:

> "Although a number of cases...have been reported, there are no recent studies reported in the literature which explore the magnitude of the problem of chronic manganese poisoning in welders.  In future epidemiological studies of various welding populations, the prevalence of this disease should be investigated.
> .....
>
> Early symptoms of chronic manganism include restlessness, irritability and a tendency to laugh or cry without purpose.  These symptoms may be followed by apathy, visual hallucinations, uncontrollable impulse, flight of ideas, mental confusion or euphoria.
>
> Mask-like facial expression, spastic grin, muscle rigidity, slow gait with sliding of the feet, increased and abnormal reflexes, monotonous blurred speech with poor articulation, tremors, irregular handwriting, impaired hearing, double vision, abnormal reactions to pain, touch, heat and pressure, excessive salivation and perspiration, sexual impotence and diminution of libido have been described by various authors....  Mental activity is reported to be slowed, judgment impaired and memory weakened, but intelligence remains normal.
> .....
>
> The observation that manganism resembles Parkinson's Disease deserves emphasis.  Although no data on the prevalence of Parkinsonism in welders are available, there is a concern that some cases of manganese poisoning could be mistakenly diagnosed as Parkinson's Disease.  Further investigations may be warranted.
>
> Manganism, like Parkinsonism, responds favorably to treatment with the drug levodopa (L-dopa), indicating that the two diseases may share certain biological

17

abnormalities: depletion of dopamine (a neurotransmitter in the basal ganglia of the brain) and depletion of melanin pigment content of the nerve cells of the substantia nigra, also in the brain."

42.    In 1978, the same consultant described above reported to the AWS Safety and Health Committee that manganese poisoning from welding fumes could be misdiagnosed as idiopathic Parkinson's Disease, and that the problem was so widespread that it required an epidemiological study.

43.    In 1979, the AWS Research Committee and the AWS Executive Committee on Safety and Health concluded that there was sufficient evidence to justify the funding of an epidemiological study that would include the study of neurological problems in welders.  The committee voted to undertake this epidemiological study, although it was never completed.

44.    In 1983, the AWS Safety and Health Committee received notice through an independent literature search that manganese poisoning is "readily confused with Parkinson's Disease," and also that in a study in India, 40% of the welders studied suffered "neurological injury."

45.    Beginning in the late 1970s and early 1980s, the Welding Defendants through the AWS Safety and Health Committee and NEMA Welding Section sponsored "Industry Defense Committee," receiving notice of claims of manganese poisoning filed as lawsuits against companies in the welding industry.

46.    In 1984, the chairperson of the AWS Safety and Health Committee admitted that "manganese fumes can cause a disease quite similar to Parkinson's Disease after six months to two years of exposure." The Welding Defendants were aware of this admission.

18

47.     Beginning in 1985 and continuing to the present, certain Welding Defendants admitted in their Manufacturer Safety Data Sheets ("MSDS"), that are technical documents of limited distribution, their knowledge that manganese in welding fumes could cause neurological damage.

48.     Because not all Welding Defendants attended each meeting, it was a regular practice of the trade association committees to publish written minutes that were disseminated to all committee members including those not in attendance, for the purpose of ratifying and adopting the actions taken and decisions made at the meetings.

49.     At a meeting of NEMA's Welding Section held on March 16, 1937, the Welding Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal known hazards associated with welding fumes by forming a "Dust and Smoke Committee" to preempt investigation of welding fume hazards by independent sources that were not controlled by the Welding Defendants.

50.     During meetings of NEMA's Welding Section held between January 20 and June 23, 1938, the Welding Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal known hazards of welding fumes by changing the language of a publication issued by an insurance company to delete the original statement in the publication that manganese in welding fumes causes a disabling illness similar to Parkinson's Disease.

51.     In 1939-40, at meetings of NEMA's Welding Section, the Welding Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal the hazards of welding

19

fumes by purporting to undertake an investigation of the health hazards of welding fumes and then, upon its completion, changing the conclusions of the study, so as to falsely represent that welding fumes were not harmful to welders.

52.    In 1949, as part of a scheme to create and disseminate false evidence useful in defending against claims brought by persons injured by exposure to welding fumes, Defendant members of NEMA's Arc Welding Section agreed to and did intentionally, knowingly, and recklessly conceal known hazards of welding fumes by providing information for and causing publication in a welding trade journal of a two-part article that made the misrepresentation that welding fumes were not toxic.

53.    In 1949 and 1951, at meetings of NEMA's Arc Welding Section which considered precautionary measures, the Welding Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by rejecting the adoption of any precautionary product labels for welding products because the Welding Defendants feared that welders would be afraid to use welding products if they saw precautionary product labels, and therefore sales of welding products would be reduced.

54.    In 1952, the Welding Defendants reorganized the AWS Safety Recommendations Committee and called a meeting to consider the furnishing of safety and health information at which they agreed to, and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by rejecting the adoption of any precautionary product labels for welding products.

20

55.     In 1952, at a meeting of the AWS Safety Recommendations Committee, the Defendants in attendance agreed to, and did intentionally, knowingly, and recklessly adopt a policy of refuting existing reports of welding fume hazards by publishing their own reports that misrepresented exposure to welding fumes as safe.

56.     In 1957, the Welding Defendants agreed to, and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by sponsoring the publication of an article in the *Welding Engineer* trade publication that made the misrepresentation that "toxic gases are not produced by electrode coatings."

57.     In 1966, at meetings of the AWS A5 Filler Metal Committee and a task group, the Defendants in attendance intentionally, knowingly, and recklessly agreed to publication in a trade journal or an article misrepresenting the health hazards of welding fumes as causing only "temporary disability."

58.     In 1966, at meetings of the A5 Filler Metal Committee of the AWS and a Task Group of that committee, the Defendants in attendance agreed to, and did intentionally, knowingly, and recklessly conceal health hazards of welding fumes by establishing industry-wide specifications for precautionary product labels that failed to warn workers of the danger of manganese in welding fumes. This precautionary label stated:

> *Welding may produce fumes and gases hazardous to health.  Avoid breathing these fumes and gases.  Use adequate ventilation.  See USAS Z49.1 "Safety in Welding & Cutting," published by the American Welding Society.*

21